## McDONNELL AIRCRAFT COMPANY, A DIVISION OF McDONNELL DOUGLAS CORPORATION, Petitioner,

### v.

### NATIONAL LABOR RELATIONS BOARD, Respondent.

### No. 86–1769.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1987.

Decided Aug. 25, 1987.

Thomas C. Walsh, St. Louis, Mo., for petitioner.

Allen R. Ferguson, Jr., Washington, D.C., for respondent.

Before ROSS,* Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

ROSS, Senior Circuit Judge.

The issue presented in this case is whether McDonnell Aircraft Company's (McDonnell) fire prevention/suppression specialists (firefighters) are guards within the meaning of section 9(b)(3) of the National Labor Relations Act, 29 U.S.C. § 159(b)(3) (1982), thereby precluding certification of Teamsters Local Union No. 682 (Local 682) as their exclusive bargaining representative. McDonnell petitions this court to review

* The Honorable Donald R. Ross assumed senior status on June 13, 1987.

the decision of the National Labor Relations Board finding that the firefighters are not guards within the meaning of the Act and that McDonnell violated sections 8(a)(5) and 8(a)(1), 29 U.S.C. §§ 158(a)(5) and 158(a)(1) (1982) by refusing to recognize and bargain with Local 682 as representative of the firefighters. The Board petitions this court for enforcement of its order.

For the reasons set forth below, we find that McDonnell's firefighters are guards for the purposes of section 9(b)(3) and that Local 682, which admits nonguards to its membership, cannot lawfully be certified as the exclusive bargaining representative of the firefighters. We therefore grant the petition for review and decline to enforce the order of the Board.

## I.

Petitioner McDonnell Aircraft Company, a division of McDonnell Douglas Corporation, is engaged in the manufacture, sale and distribution of aircraft and related aerospace products at its facility in St. Louis, Missouri. These operations include the manufacture and assembly of state of the art aircraft and aerospace products for the United States military services. During its three shifts of operation, McDonnell employs 53 fire prevention/suppression specialists as well as 221 full-time and 77 part-time security guards.

On February 8, 1985, Local 682 filed a representation petition with the National Labor Relations Board seeking certification as the collective bargaining representative of the 53 McDonnell firefighters. On February 27, 1985 a hearing was held at which McDonnell contended that the firefighters were guards within the meaning of section 9(b)(3) and that therefore Local 682, which represents nonguard employees, was precluded from certification as the exclusive bargaining representative of the firefighters. The Board's Regional Director issued a decision rejecting McDonnell's contention and directed an election among the employees. The April 12, 1985 election resulted in 40 votes for and 13 votes against the Union, and on October 7, 1985 the Regional Director certified Local 682 as the exclusive bargaining representative of the firefighters.

McDonnell subsequently refused to bargain collectively with the Union and, in response, Local 682 filed unfair labor practice charges against McDonnell. On April 21, 1986 the Board issued a Decision and Order finding that McDonnell's conduct constituted an unlawful refusal to bargain under sections 8(a)(1) and 8(a)(5) of the Act. McDonnell has petitioned this court for review of the Board's decision and the Board has cross-petitioned for enforcement of its order.

## II.

Section 9(b)(3) of the National Labor Relations Act, 29 U.S.C. § 159(b)(3) (1982), was passed by Congress in 1947 as part of the Taft-Hartley Act. The section provides that

the Board shall not

(3) decide that any unit is appropriate for [collective bargaining] if it includes, together with other employees, any individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

The relevant portion of the statute precludes the Board from certifying a union as the representative of a unit of guards if the union either admits nonguard employees to membership or is affiliated with a union that does so.

It is undisputed in the instant case that Local 682 admits employees other than guards to membership. The only issue before this court, then, is whether McDonnell's firefighters come within the statutory definition of "guard" under section 9(b)(3) thereby prohibiting certification of

Local 682 as their bargaining representative.

The determination of guard status under the Act oftentimes presents close, factual questions on which Board policy has been anything but uniform. *See NLRB v. Paper Art Co.*, 430 F.2d 82, 84 (7th Cir.1970) and cases cited therein. For our initial focus, therefore, we turn to the legislative history of section 9(b)(3) to determine whether congressional policy requires the exclusion of McDonnell's firefighters from membership in a nonguard union. According to the legislative history of the Act, congressional enactment of section 9(b)(3) was largely in response to the Supreme Court's decision in *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947) which held that the Board could order an employer to bargain with a union certified to represent a unit of plant guards, even though the union also admitted nonguard employees. *See* 93 CONG.REC. 6444, *reprinted in* II NLRB, *LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT RELATIONS ACT 1947*, 1541 (1948) (statement of Sen. Taft). The Supreme Court's opinion reversed the decision of the Sixth Circuit, 154 F.2d 932 (6th Cir.1946), which previously found inappropriate the representation of both plant guards and production employees by the same union. The Sixth Circuit reasoned that guards who belong to a union also representing nonguards would experience conflicting loyalties in the event of a strike because their obligation to the employer and the community would be incompatible with their obligation to the striking union. *Id.* at 935. Finding this reasoning persuasive, Congress enacted section 9(b)(3) within the following year in order to minimize the danger of divided loyalties.

The difficulty of section 9(b)(3) analysis arises in the appropriate characterization of a particular bargaining unit given the equivocal nature of a statutory guard. The Board and reviewing courts have consistently declined to restrict the application of section 9(b)(3) to "plant security guards," *Truck Drivers Local 807 v. NLRB*, 755 F.2d 5, 9 (2d Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 225 (1985), finding on various occasions that unarmed courier service drivers, *Local 851, Int'l Brotherhood of Teamsters v. NLRB*, 732 F.2d 43, 44 (2d Cir.1984); fitting room checkers, *Broadway Hale Stores, Inc.*, 215 N.L.R.B. 46 (1974); timekeepers, *Tulsa Hotel Management Corp.*, 135 N.L.R.B. 968, 971 n. 8 (1962); armored car guards, *Armored Motor Service Co.*, 106 N.L.R.B. 1139, 1140 (1953); and receptionists, fire patrolmen, chauffeurs and investigators, *Republic Aviation Corp.*, 106 N.L.R.B. 91 (1953) come within the ambit of the section 9(b)(3) definition of "guard."

Although uniform criteria have not been established in regard to the characterization of employees under section 9(b)(3), the common theme which runs throughout Board and reviewing court decisions is the legislative policy of avoiding the potential of divided loyalty in any employee who is vested with the authority to enforce rules and regulations for the protection of company property. The consistent goal has been to "insure an employer that he would have a core of plant protection employees, during a period of industrial unrest and strikes." *Lion Country Safari and Hospital and Service Employees Union, Local 399*, 225 N.L.R.B. 969, 970 (1976). Therefore, the appropriate categorization of employees as statutory guards "will depend largely on the extent to which they protect [company] property." *Burns Int'l Security Services, Inc.*, 278 N.L.R.B. 70, —— (1986).

The duty to protect company property is not sufficient in and of itself to confer guard status upon a bargaining unit. By the plain language of section 9(b)(3) the employee must also be obligated "to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises." 29 U.S.C. § 159(b)(3) (1982). *See also United States Gypsum Co.*, 152 N.L.R.B. 624, 627–28 (1965). It is the obligation to protect the employer's property combined with the responsibility to enforce rules against fellow employees which create the potential for

divided loyalty that Congress sought to avoid in section 9(b)(3).

The Board has chosen to interpret the rule enforcement requirement very broadly, finding it sufficient that the employee's only responsibility is to report rule infractions to his supervisor where no element of personal confrontation is involved. In *Wright Memorial Hospital,* 255 N.L.R.B. 1319 (1980), the Board characterized six ambulance drivers as guards within the meaning of the Act based on their duty to make security rounds twice a shift. The Board found that these employees are "employed to enforce, against employees and others, rules to protect the Employer's property and the safety of persons on the premises. It is immaterial that they do not themselves enforce these rules." The Board reasoned that "it is sufficient that they possess and exercise responsibility to observe and report infractions, as this is an essential step in the procedure for enforcement of [the employer's] rules." *Id.* at 1320. *See also MGM Grand Hotel,* 274 N.L.R.B. 139, 140 (1985); *A.W. Schlesinger Geriatric Center, Inc.,* 267 N.L.R.B. 1363, 1364 (1983).

The Board has also held that the performance of guard duties need not be the employee's only function in order to attain section 9(b)(3) guard status. In *MGM Grand Hotel, supra,* the bargaining unit at issue consisted of employees who operated and monitored an automated life-safety fire alarm system. The system operated primarily for fire detection but was also used for security and engineering functions. The operators were primarily responsible for monitoring the system for fire prevention, however, they also monitored door exit alarms, stairwell motion detectors and a watch tour system. They also performed functions related to heating, ventilation and air conditioning which were the responsibilities of the engineering department. In the event of an alarm, an operator's only duty was to acknowledge the alarm by pushing a button to notify security or other appropriate department. Upon notification, a department employee would come to the control room and take control of the operations. "The operators perform no physical duties in rectifying the alarm or abnormal situations." 274 N.L.R.B. at 139.

The Board held that the systems operators were guards within the meaning of section 9(b)(3). Citing *Reynolds Metals Co.,* 198 N.L.R.B. 120 (1972), the Board stated that the fact "[t]hat the operators spend only a portion of their time monitoring [security] functions is immaterial in determining their status as guards under the Act." *MGM Grand, supra,* 274 N.L. R.B. at 140.

### III.

Within this analytical framework, we now turn to the facts of the case before us. The record establishes that McDonnell Aircraft Corporation occupies an eleven million square foot manufacturing and office complex located in St. Louis County, Missouri, adjacent to the Lambert St. Louis International Airport, known as the Lambert Field Complex. McDonnell also occupies buildings at approximately six other locations in St. Louis County, St. Louis City and St. Charles County, Missouri. McDonnell's three fire stations are located at the Lambert Field Complex.

The McDonnell firefighters work one of three rotating, eight-hour shifts and are assigned to one of the company's three fire stations. The firefighters report directly to fire lieutenants, who in turn report to fire captains. The captains report to the fire chief who has overall responsibility for fire services. On each shift, certain firefighters are assigned to standby duty on crash trucks and pumpers which requires them to remain at their respective fire stations prepared to respond to fires, explosions, airplane crashes or chemical spills. Firefighters who are not assigned standby duty perform a variety of fire prevention functions including fire inspection tours of the company's buildings and other facilities with special emphasis on areas where explosive or flammable materials are stored or where aircraft are located. During these tours, the firefighters look for fire and other hazards including blocking of access to fire equipment, obstructions to

doorways and hallways, and the violation of company rules such as the prohibition of smoking and the requirement that explosives and hazardous materials be stored safely. The firefighters are assigned work schedules which include the periodic inspection and maintenance of chemical fire extinguishers, fire alarms, sprinkler systems, fire trucks and other fire equipment. They also issue welding permits and observe welding operations. The firefighters are responsible for ensuring the safety of the company's aircraft. They determine if the aircraft fuel tanks have been filled with inert gas to render the aircraft fuel less combustible. They ensure that the aircraft are roped off, that no smoking signs are posted and that fire extinguishers are within 50 feet of the aircraft. The firefighters also escort inerted aircraft in tow and stand by during flights in case of emergency.

The firefighters' current job description provides that the firefighters enforce "Company Rules and Regulations, Control Procedures, Process Specifications, Manufacturing Methods, Procedures and various safe practice procedures." The phrase "Company Rules and Regulations" refers to 42 general company rules and regulations contained in McDonnell's Fire Protection Manual. The manual specifically states that not only must the firefighters comply with these rules but that they must also "assist in the enforcement of those marked with an asterisk (*) by reporting such infraction to responsible supervision and Fire Protection supervisor." Specifically, the firefighters are obligated to enforce rules regarding:

1. Smoking in prohibited areas.

29. Unauthorized removal or attempted removal of classified material, personal property of others, Company or government property.

30. Failure to safeguard properly classified material in accordance with applicable Company security procedures.

35. Failure to comply with instructions of those in authority, including members of the plant protection forces.

36. Repeated violation of any rule or rules, including safety and security.

39. Tampering with, removing from established locations, or the unauthorized use of portable fire extinguishers or other fire protection equipment.

McDonnell Douglas, Fire Protection Manual.

A firefighter's most frequent method of rule enforcement is the completion of a Hazard-Incident Report. Upon completion, the Hazard-Incident Report is submitted to the firefighter's supervisor and is used to determine the necessary corrective action to be taken and notes the action, if any, which has already been taken to correct the hazard or incident. The firefighter's supervisor reviews the report, has the report typed and determines the appropriate action to be taken. If the hazard constitutes an imminent threat to life or safety, or is easily remedied, the firefighter has the authority to take immediate action to correct the hazard. For example, a firefighter who observes an employee smoking in a prohibited area has the authority to order the employee to cease. Firefighters protect against theft and unauthorized entry through their regular responsibilities to ensure that appropriate doors are locked and by exercising control over unlocked doors.

McDonnell's security guards, on the other hand, are primarily responsible for controlling access to company property, enforcing the company's rules and reporting and conducting preliminary investigations of such matters as unauthorized entry, theft, traffic violations, and threats to commit sabotage or espionage. The guards conduct regular security clock patrols requiring the guards to follow a set route through the buildings at specific times. Both guards and firefighters are uniformed, although the uniforms are distinguishable by color. Firefighters and guards both have access to secured areas. Both firefighters and security guards are obligated to detect hazards and conditions which would affect the production of the facility or put the facility in a hazardous condition.

Firefighters and guards are assigned special duties during a strike. Under McDonnell's current strike plan of 1984, firefighters' duties are broadened to include roving inspections of certain key buildings checking for and reporting or correcting, any unusual circumstances. Firefighters, along with security guards, are required to report to a strike control center, which during the 1975 strike was set up at the security guard headquarters. A special log of events is to be maintained and taken every shift to the strike control officer. In 1978, the Director of Security, the Chief of Fire Services and the Chief of Guard Services devised an unwritten plan whereby the firefighters would use equipment on their pumper trucks as water cannons if necessary to control unruly crowds.

Based on the foregoing facts, the Board concluded that McDonnell's firefighters are not guards within the meaning of section 9(b)(3). Although the Board acknowledged the firefighters' rule enforcement obligations, it disregarded those duties in relation to section 9(b)(3) finding them to be "in conjunction with their responsibility for fire prevention or suppression." In its brief the Board explained its position stating that section 9(b)(3) only applies to employees who perform security or police-type duties as major and continual parts of their jobs. We disagree with the Board's characterization of the McDonnell firefighters' rule enforcement duties and further find that the Board's narrow interpretation of section 9(b)(3) is not only inconsistent with previous Board decisions but is also contrary to the legislative purpose and plain language of the statute.

As previously noted, the firefighters are specifically obligated to enforce rules regarding smoking in prohibited areas; the unauthorized removal of classified material, personal property of others or company or government property; the failure to safeguard classified materials; the failure to comply with instructions of those in authority; and the repeated violation of any rule including safety and security. The firefighters are authorized to issue Hazard-Incident Reports, which if filed against another employee, could adversely affect the employee's personnel file. Furthermore, in the event of a strike the firefighters perform additional rule enforcement activities such as crowd and traffic control, patrolling for striker misconduct, and clearing obstructions set up by strikers. Based on the record we find that the firefighters are expected to and do perform functions conclusively establishing their status as guards. The Board's finding to the contrary is without sufficient evidence based on the record as a whole.[1]

Furthermore, the Board's restriction of section 9(b)(3) application to the enforcement of security rules only cannot be reconciled with the plain language of the statute. More importantly, such a restriction is inconsistent with the recognized function of section 9(b)(3) which is to provide the employer with a core of plant protection employees, particularly during a time of labor unrest. The congressional intent was to avoid the potential for split allegiance which would serve to jeopardize that plant protection. The potential for divided loyalty is not limited to "security" or "police-type" rule enforcers but instead exists whenever any employee is vested with rule enforcement obligations in relation to his co-workers. In the present case, the certification of a nonguard union as the representative of the unit of McDonnell's firefighters poses a significant danger of divided loyalty. The firefighters are vested with substantial obligations regarding the protection of company property and the safety of persons on the employer's premises. This obligation is heightened during

**1.** Thirty-three years ago the Board held that McDonnell's firefighting employees were not guards within the meaning of section 9(b)(3). *McDonnell Aircraft Corp.,* 109 N.L.R.B. 967 (1954). During the thirty-three years that have elapsed there has been a significant evolution in both the job descriptions and job responsibilities of the McDonnell firefighters. Today, the firefighters are primarily concerned with fire prevention rather than merely fire suppression. As such they have assumed significant rule enforcement responsibilities, both during normal plant operations and during emergencies or periods of labor unrest. We therefore distinguish the Board's earlier *McDonnell* decision based on the change in circumstances.

periods of labor unrest. The potential for a conflict of loyalty could arise, for example, if, during a strike, the firefighters are called upon to assist in the event of a fire or other threat to company property. The firefighters may not only be asked to cross their union's picket lines, but they may also be required to enforce plant rules and regulations against their fellow striking union members. This conflict of loyalty may seriously impair the continued protection of the employer's facility. We believe that this conflict of loyalty typifies the controversy that Congress sought to avoid in section 9(b)(3). Although great deference is generally given to the Board, courts must not "rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying the statute." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

We therefore grant the petition for review and deny the petition for the enforcement of the Board's order.