BPS GUARD SERVICES, INC., d/b/a Burns International Security Services, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 89–2373.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1991.

Decided Aug. 21, 1991.

Rehearing and Rehearing En Banc Denied Oct. 11, 1991.

Joseph L. Randazzo, Buffalo, N.Y., for petitioner.

Charles Donnelly, argued (Margaret Luke, Jerry M. Hunter and Aileen Armstrong, on brief), Washington, D.C., for respondent.

Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and HANSON,* District Judge.

---

* The HONORABLE WILLIAM C. HANSON, United States Senior District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. *BPS Guard Servs., Inc., d/b/a Burns Int'l Sec. Servs.*, 296 N.L.R.B. No. 16 (August 15, 1989) (1989 W.L. 224261). The captions of BPS's proceedings before the Board hereinafter will be abbreviated *BPS Guard Servs.*

BOWMAN, Circuit Judge.

Petitioner, BPS Guard Services, Inc., d/b/a Burns International Security Services (hereinafter BPS), petitions us to set aside the August 15, 1989 Decision and Order[1] and the September 28, 1990 Supplemental Decision and Order[2] of the National Labor Relations Board (hereinafter Board), which require that BPS bargain with United Steelworkers of America, AFL–CIO (hereinafter Union) as the exclusive bargaining representative of a unit that includes BPS's fire protection employees (hereinafter firefighters). The Board cross-petitions for the enforcement of the same orders. Because BPS "maintains operations and transacts business in this circuit," Petitioner's Brief at 1, jurisdiction is proper under 29 U.S.C. § 160(f) (1988). We grant BPS's petition for review and set aside the Board's orders. The Board's cross-petition for enforcement is denied.

I.

BPS provides Bethlehem Steel Corporation (hereinafter Bethlehem) with security and fire protection services at its Burns Harbor plant in Chesterton, Indiana, employing twenty-seven full-time, and five part-time, firefighters in the process. Six fire lieutenants supervise the firefighters. The lieutenants are supervised by a fire chief who heads the fire department. In addition to supervising the fire lieutenants and the firefighters, the fire chief also is in charge of twelve paramedics and a firehouse mechanic.[3]

BPS's firefighters receive the same orientation program as the security guards also employed by BPS, wear uniforms, although different from those worn by the security guards, and are registered as private detectives in the state of Indiana. They have a variety of duties including the

2. *BPS Guard Servs.*, 300 N.L.R.B. No. 34, 135 L.R.R.M. (BNA) 1153 (September 28, 1990).

3. BPS also employs forty-two security guards. The fire chief, fire lieutenants, firefighters, paramedics, and mechanic, all work out of the fire department.

requirement that they testify in grievance arbitration hearings at Bethlehem, maintain a professional distance between themselves and their clients' employees, conduct various fire and safety checks, maintain fire and safety equipment, and monitor Bethlehem's employees for compliance with fire and safety standards. In addition, if they discover a violation of a fire or safety rule, they are required to report it in writing to their supervisor,[4] although in a number of situations they are authorized and required to take more action.[5]

## II.

The seeds of the present dispute were sown in February 1988, when the Union filed a petition with the Board seeking to represent "all employees working in the fire protection area and in the fire house at the Bethlehem Burns Harbor Plant." Joint Appendix at 2 (Union's Petition). At a hearing on the matter, BPS opposed the Union's petition arguing that its firefighters qualified as guards under Section 9(b)(3) of the National Labor Relations Act, ch. 372, § 9(b), 49 Stat. 449, 453 (1935), *as amended by* Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136, 143 (codified as amended at 29 U.S.C. § 159(b)(3) (1988)) (hereinafter Section 9(b)(3)). That section prohibits certification of any labor organization "as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards." Section 9(b)(3). The Union conceded that, under this section, it could not represent guards.

*See* Official Report of Proceedings before the National Labor Relations Board at 90, No. 25–RC–8557 (March 17, 1988) (hereinafter Hearing Transcript).

Throughout the administrative proceedings in this matter, BPS relied upon our decision in *McDonnell Aircraft Co., a Div. of McDonnell Douglas Corp. v. NLRB*, 827 F.2d 324 (8th Cir.1987) (hereinafter *McDonnell II*), in which we denied the enforcement of a Board order requiring McDonnell Aircraft Company (hereinafter McDonnell) to bargain with the Teamsters as the exclusive bargaining unit for McDonnell's firefighters. We held that McDonnell's firefighters were guards within the meaning of Section 9(b)(3), despite the Board's contrary conclusion. Nevertheless, on April 7, 1988 the Board's Regional Director issued a Decision and Direction of Election holding that BPS's firefighters were not guards under Section 9(b)(3). In doing so, the Regional Director relied upon the Board's decision in *McDonnell Aircraft Co.*, 279 N.L.R.B. 357 (1986) (hereinafter *McDonnell I*), *enf. denied, McDonnell II*, which as BPS pointed out, was the decision we later refused to enforce in *McDonnell II*. Consequently, BPS sought Board review of the decision, but the Board denied review. Thereafter, BPS challenged all decisions and orders of the Board that were based upon this initial determination. In the process, it consistently argued that the decision of the Regional Director was invalid as it was made without considering our decision in *McDonnell II*. Nevertheless, the Regional Director ultimately certified the Union as the firefighters' exclusive col-

---

**4.** A sampling of some of these reports was admitted into evidence in the hearings below. They concern such matters as blocked fire hydrants and other problems with fire safety equipment, uncovered drain trenches, the presence of the odor of natural gas and of used oil on the ground, the performance of welding and burning without a fire watch, hazardous conditions present during welding, smoking in a prohibited area, and other hazardous conditions. *See* BPS's Exhibits 7(a)–(r); *see also* Official Report of Proceedings before the National Labor Relations Board at 84–86 & 106–07, No. 25–RC–8557 (March 17, 1988).

**5.** In addition, all of BPS's employees, including its firefighters, are given a security handbook that includes a number of general security rules. In its Supplemental Decision and Order the Board points out that it attaches little significance to this fact. *See BPS Guard Servs.*, 300 N.L.R.B. No. 34 at 12–13 n. 22, 135 L.R.R.M. (BNA) at 1156 n. 22. The Board also discounts the testimony of Harry Beach, BPS's area supervisor, that he had been informed by Bethlehem that, in the event of a strike, BPS's firefighters would be used to augment plant patrols. *Id.* at 4. We reach our conclusion that the Board's orders must be set aside without consideration of these factors. *See infra* part V.

lective bargaining representative. Neither the Regional Director nor the Board ever addressed BPS's arguments regarding *McDonnell II.* Because BPS refused to recognize or bargain with the Union, the Board's General Counsel filed a Complaint and Notice against BPS for engaging in unfair labor practices and also filed a motion for summary judgment.

Despite BPS's arguments regarding the applicability of *McDonnell II,* the Board granted the General Counsel's motion for summary judgment. *See BPS Guard Servs.,* 296 N.L.R.B. No. 16 (August 15, 1989) (1989 W.L. 224261). It reasoned that "[a]ll representation issues raised by [BPS] were or could have been litigated in the prior representation proceeding," and that in addition, because BPS did not produce "any newly discovered and previously unavailable evidence," and because there were no other "special circumstances" that merited Board re-examination of the representation proceeding, BPS "[had] not raised any representation issue ... property litigable in this unfair labor practice proceeding." *Id.* at 2. In a footnote to its decision, the Board acknowledged that in ruling that BPS's firefighters were not guards within the meaning of Section 9(b)(3) the Regional Director had relied upon the *Board's* unenforced decision in *McDonnell I. See id.* at 2 n. 1. The Board then responded for the first time to BPS's arguments regarding *McDonnell II.* In response to the argument that the Regional Director's conclusions were invalid in light of this Court's denial of enforcement to the *McDonnell I* decision, the Board simply stated that "[w]ith all due respect to the [Eighth Circuit] court of appeals, we rejected that contention in the representation case." *Id.* It concluded with an order that requires, *inter alia,* that BPS bargain with the Union. *Id.* at 5. BPS then sought review here, but upon motion by the Board

we remanded the case for further consideration.[6]

On September 28, 1990, the Board issued its Supplemental Decision and Order, *see BPS Guard Servs.,* 300 N.L.R.B. No. 34, 135 L.R.R.M. (BNA) 1153 (September 28, 1990), in which it reaffirmed, in whole, its order of August 15, 1989. *See BPS Guard Servs.,* 300 N.L.R.B. No. 34 at 13.[7] The Board expressly acknowledged that its decision was not based upon the fact that BPS's firefighters did not "enforce Bethlehem's rules and regulations personally," *id.* at 13 n. 23, 135 L.R.R.M. (BNA) at 1157 n. 23, or the fact that BPS also employed security guards at the same location. *Id.,* 135 L.R.R.M. (BNA) at 1157 n. 23. In addition, it expressly found that BPS's firefighters were charged with enforcing BPS's "fire and safety rules," *id.* at 5, 135 L.R.R.M. (BNA) at 1154, and it explicitly acknowledged our decision in *McDonnell II,* quoting that portion in which we held that the "potential for divided loyalty is not limited to 'security' or 'police-type' rule enforcers but instead exists whenever any employee is vested with rule enforcement obligations in relation to his co-workers." *Id.* at 9, 135 L.R.R.M. (BNA) at 1155 (quoting *McDonnell II,* 827 F.2d at 329). However, despite *McDonnell II,* the Board held that to qualify as Section 9(b)(3) guards, employees must perform security functions as "an essential part of their duties," *id.* at 12–13, 135 L.R.R.M. (BNA) at 1156–57, and those security functions must "encompass[ ] traditional police and plant security functions." *Id.* at 8, 135 L.R.R.M. (BNA) at 1155. It then concluded that BPS's firefighters' security functions were not essential to their duties and were not of the type "typically performed by guards." *Id.* at 12, 135 L.R.R.M. (BNA) at 1156. It also challenged the reasoning of *McDonnell II* on the ground that it conflicted with Board precedent and that it allegedly conflicted with congressional intent. *See id.* at 9–11,

---

**6.** However, we did "retain jurisdiction over the appeal pending completion of the proceedings on remand." Supplemental Joint Appendix at 5 (*BPS Guard Servs. v. NLRB,* No. 89–2373 (8th Cir. Oct. 31, 1989) (Order Granting Respondent's Motion For Remand)).

**7.** The cited portion of the Board's order is not included in the parallel citation of 135 L.R.R.M. (BNA) 1153.

135 L.R.R.M. (BNA) at 1155–56. Also, for the first time, the Board attempted to distinguish the case at bar from *McDonnell II* on the basis that, in *McDonnell II,* the firefighters that we found to be guards "were specifically charged with enforcing rules regarding … the unauthorized removal of classified material … and, in the event of a strike, with performing security-related duties…." *Id.* at 12 n. 21, 135 L.R.R.M. (BNA) at 1156 n. 21. It then upheld its decision of August 15, 1989.

BPS now petitions this court for review. It argues that the Board, in all the proceedings below, consistently refused to apply the law of this circuit as set forth in *McDonnell II.* Likewise, it argues that the Board's conclusion, that employees must "actually perform … security functions typically performed by guards," *id.* at 12, 135 L.R.R.M. (BNA) at 1156, in order to qualify as Section 9(b)(3) guards, is contrary to *McDonnell II*'s holding and consequently is incorrect as a matter of law. Finally, BPS argues that neither the record nor the law supports the Board's conclusions that (1) the firefighters' rule enforcement responsibilities are minimal and incidental to fire prevention, (2) their rule enforcement responsibilities are not an essential part of their jobs, and (3) their rule enforcement duties do not create a conflict of loyalties.[8]

The Board responds by arguing that "the [Eighth Circuit's] broad statement of the scope of Section 9(b)(3) in *McDonnell [II]* should not substitute for well-established Board precedent," Respondent's Brief at 23, and it insists that our interpretation of Section 9(b)(3), as set forth in *McDonnell II,* is invalid as a matter of law. In fact, the Board continues to take the position that Section 9(b)(3) applies only to employees who perform security or police-type duties as major and continual parts of their jobs, despite our rejection of precisely the same argument in *McDonnell II.* Furthermore, it asserts that the issue raised here is not whether *McDonnell II* applies to the instant case, but rather whether the Board properly exercised its discretion in determining that BPS's firefighters are not Section 9(b)(3) guards, *see* Respondent's Brief at 7–8, 27–28, and it insists that its determination should be upheld if found to be reasonable. *Id.* at 27–28, 33. Finally, the Board argues that *McDonnell II* is factually distinct from the case at bar, and suggests, in the last footnote to its brief, that if we do not agree, an en banc hearing may be appropriate. *See id.* at 34 n. 8. For the reasons set forth below, we reject the Board's belated effort at distinguishing this case from *McDonnell II. See infra* part V. We also find no merit in the remainder of the Board's arguments, and thus find nothing that would warrant a hearing en banc.

### III.

Initially the Board argues that "the only question before the Court is whether the Board acted within its discretion in certifying the Union," Respondent's Brief at 7, and it reminds us that the Board's discretion is broad. *See id.* (citing, *inter alia, Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947) (holding that Board determinations of unit issues involves a "large measure of informed discretion.")). It also argues that this court must not "'simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.'" Respondent's Brief at 27 (quoting *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted)). While we agree with these statements of law, we find them inapplicable to the situation before us. *Chevron* does not stand for the proposition that administrative agencies may reject, with impunity, the controlling precedent of a superior judicial body. If indeed the Board believed this circuit's interpretation of Section 9(b)(3) improperly encroached upon

---

8. With regard to the last conclusion, BPS only argues that it is unsupported by the record.

Board authority, it should have raised its *Chevron* argument in *McDonnell II*, at which time this interpretation was not yet binding precedent. An agency's decision to refuse to follow controlling precedent hardly can be characterized as an exercise of discretion. *See Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 970 (3rd Cir.1979). We will enforce the Board's decisions only if they have " 'warrant in the record' and a reasonable basis in law." *Allied Chem. & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 166, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971) (quoting *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944)). Because the focus of BPS's arguments throughout this litigation has been that the Board erred as a matter of law by refusing to apply *McDonnell II*, we first review the Board's orders to determine if they indeed have a reasonable basis in law.

### IV.

■ The Board never sought a rehearing or rehearing en banc of our decision in *McDonnell II*, nor did it petition the United States Supreme Court for a writ of certiorari.[9] Consequently, *McDonnell II* is the final "decision of the court of last resort in this federal circuit." *Allegheny*, 608 F.2d at 970. It is the law of the circuit on the question of the kinds of duties that qualify employees as Section 9(b)(3) guards, and its holding on this issue is "binding on all inferior courts and litigants in the [Eighth Circuit]," *id.*, including administrative agencies dealing with matters pertaining to this circuit. *See id.* Furthermore, because "Congress has not given to the NLRB the power or authority to disagree, respectfully or otherwise, with decisions of this court," *id.*, the Board's disagreement with *McDon-*

*nell II* is of no legal consequence in this circuit. *McDonnell II* sets forth the law of this circuit, and "[f]or the Board to predicate [orders] on its disagreement with [*McDonnell II* ] is for it to operate outside the law." *Allegheny*, 608 F.2d at 970. As the central issue throughout this litigation has been whether BPS's firefighters qualify as Section 9(b)(3) guards, we conclude that *McDonnell II* is controlling here. Because the Board refused to apply *McDonnell II*, the orders now under review are not based upon the correct legal standard. We therefore will grant them enforcement only if we conclude that, even applying *McDonnell II*, BPS's firefighters still do not qualify as Section 9(b)(3) guards.

### V.

■ In *McDonnell* the firefighters each worked one of three rotating eight-hour shifts. On each shift, some of the firefighters remained with the crash trucks and pumpers and remained in a general state of readiness to respond to any emergency that might arise. The others performed a variety of tasks including making fire inspection tours, checking for obstructed fire equipment, doors, and hallways, checking for violations of company rules such as the prohibition against smoking and the improper storage of explosive materials, periodically inspecting and maintaining the fire prevention/protection equipment, issuing welding permits, observing welding operations, checking to be sure that certain doors were locked, and ensuring the safety of McDonnell's aircraft. *McDonnell II*, 827 F.2d at 327–28. In addition, the firefighters were charged with the enforcement of rules regarding smoking restrictions, theft of property, violations of safety rules regarding classified materials, insubordination,[10] repeated violations of company rules,[11] and tampering

---

**9.** The Board's opportunity to challenge *McDonnell II* through these avenues has long since expired. *See* 8th Cir.R. 35A; Fed.R.App.P. 35(c), 40(a) (petitions for rehearing and suggestions for rehearing en banc must be made within fourteen days after the entry of judgment); Sup.Ct.R. 13.1–13.3 (petitions for writs of certiorari must be filed within, at the most, 150 days after the entry of judgment).

**10.** This expressly included insubordination with respect to the instructions of "plant protection forces." *McDonnell II*, 827 F.2d at 328 (quoting McDonnell Douglas, Fire Protection Manual).

**11.** This expressly included safety and security rules. *See McDonnell II*, 827 F.2d at 328 (quoting McDonnell Douglas, Fire Protection Manual).

with fire extinguishers. *Id.* at 328 (quoting McDonnell Douglas, Fire Protection Manual). Finally, in the event of a strike, the firefighters were to report to a special strike control center, make roving patrols of certain buildings, and, possibly, use the equipment on their fire trucks to control unruly crowds.[12] *Id.* at 329. In most situations, the firefighters could enforce rules only by filling out a Hazard–Incident Report and submitting it to their supervisors who then determined what, if anything, would be done to correct the situation. Only when there was an imminent threat to life or safety, as when an employee was smoking in a hazardous area, did the firefighters have the authority to take immediate action to correct the problem.

The duties of BPS's firefighters are substantially similar to those of McDonnell's firefighters. Like McDonnell's firefighters, BPS's firefighters inspect for fire hazards, obstructed fire equipment, doors, and hallways, and they too are charged with enforcing the no-smoking policy. As in *McDonnell II*, the firefighters here are responsible for inspecting and maintaining the fire prevention/protection equipment, and although they do not issue Bethlehem's employees "permits" to perform hot work such as burning and welding, they do oversee such work and are responsible for en-

suring that any such work is performed in compliance with appropriate fire safety rules.[13] As in *McDonnell II*, the firefighters here are charged with responsibility to report violations of certain fire and safety rules, and as in *McDonnell II*, their primary form of rule enforcement is the written report. As in *McDonnell II*, BPS's firefighters are permitted to take more direct rule enforcement action under certain circumstances, and in this regard their duties are at least as broad as, and perhaps broader than, those in *McDonnell II*.[14]

Nevertheless, the Board contends that the cases are factually distinct. For example, it argues that "the *McDonnell* firefighters' written job description required them to enforce *all* of their employer's 42 general rules and regulations...." Respondent's Brief at 23–24 (emphasis in original). This, however, simply is not correct. *McDonnell II* makes very clear that the firefighters there were obliged to *comply* with the forty-two general company rules and regulations, but only required to "'*assist in the enforcement* of those marked with an asterisk (*) by reporting such infraction to responsible supervision and [to the] Fire Protection supervisor.'" *McDonnell II*, 827 F.2d at 328 (quoting McDonnell Douglas, Fire Protection Manual) (emphasis added).[15] The Board also implies that

**12.** This was included in a plan devised by the Director of Security, the Chief of Fire Services, and the Chief of Guard Services, but apparently it had not been carried out prior to our decision in *McDonnell II*. *McDonnell II*, 827 F.2d at 329.

**13.** This is the case regardless of whether the authority to shut a job down lies with the firefighter, or the fire lieutenant as the Board concludes, *see BPS Guard Servs.*, 300 N.L.R.B. No. 34 at 4 n. 9, 135 L.R.R.M. (BNA) at 1154 n. 9, as it is the firefighter who is responsible for making the initial determination of whether the job site is safe enough for the hot work to begin, and the firefighter is required to notify Bethlehem, as well as the shift fire lieutenant, when Bethlehem's employees violate a fire safety rule during hot work. *Cf. id.* at 13 n. 23, 135 L.R.R.M. (BNA) at 1157 n. 23 ("[i]t is well established that individuals may be found to be guards even if they possess and exercise only the responsibility to observe and report infractions.").

**14.** Mr. Matava, the client contact person at Bethlehem, expects BPS's firefighters to warn

violators of Bethlehem's no-smoking rules and to obtain some means of identifying the violator. BPS's firefighters also can cause a vehicle to be ticketed for blocking a fire hydrant. They report directly to the supervisor instances of employees engaging in horseplay, and they also are charged with reporting directly to the Bethlehem supervisor if Bethlehem employees are performing work under unsafe conditions. In the latter situation, they are to notify a fire lieutenant if, in the firefighter's opinion, a job should not continue without correction of the fire or safety problem. The McDonnell firefighters, although "obligated to enforce," *McDonnell II*, 827 F.2d at 328, a number of rules, apparently were only authorized to do so only by means of a report unless "the hazard constitute[d] an imminent threat to life or safety, or [was] easily remedied." *Id.*

**15.** Only six were marked with asterisks, those being the rules against smoking in prohibited areas, theft of classified material, improper handling of classified material, insubordination, repeated violations of any rules, and tampering

this case is distinct from *McDonnell II* because the firefighters in *McDonnell II* reported violations of company rules "directly to their supervisors." Respondent's Brief at 24. However, this method for reporting violations is standard operating procedure for BPS's firefighters.

The Board points out that McDonnell's firefighters "were required to 'exercis[e] control of [sic] unlocked doors' ... and enforce rules regarding the safeguarding of classified material or failure to comply with management's instructions." [16] Respondent's Brief at 24 (quoting *McDonnell II*, 827 F.2d at 328). It also attempts to distinguish *McDonnell II* on the basis that the employer there had a formal strike contingency plan, *see* Respondent's Brief at 24, under which McDonnell's firefighters were to perform additional security duties in the event of a strike. *See McDonnell II*, 827 F.2d at 329. While we agree that these are factual distinctions between this case and *McDonnell II*, we do not believe they warrant a different outcome here. In light of the substantial similarities between the duties of the McDonnell and BPS firefighters, we are unconvinced that the "danger of divided loyalty," *McDonnell II*, 827 F.2d at 329, which is the measuring stick of Section 9(b)(3) status, is significantly less present here because the BPS firefighters do not check doors and are not required to write up reports with regard to insubordination and improper handling of classified material. Similarly, we do not find a controlling difference in the fact that absent here is a formal strike contingency plan similar to the one in *McDonnell II*. BPS requires its firefighters to report violations of fire and safety rules and to testify against other employees in Bethlehem's grievance arbitration hearings. Such duties clearly create a potential for divided loyalty if the firefighters are included in

the same bargaining unit as the employees whose conduct the firefighters monitor and against whom they are required to testify. Thus, we conclude that, although there are minor factual distinctions between this case and *McDonnell II*, they do not warrant distinguishing between BPS's and McDonnell's firefighters insofar as their Section 9(b)(3) status is concerned. Consequently, we conclude that under *McDonnell II* the duties of BPS's firefighters qualify them as Section 9(b)(3) guards, and therefore we hold that the challenged orders have no reasonable basis in law or warrant in the record.

## VI.

BPS's petition for review is granted and the Board's orders in this matter are set aside. The Board's cross-petition for enforcement is denied.

with fire safety equipment. *See McDonnell II*, 827 F.2d at 328 (quoting McDonnell Douglas, Fire Protection Manual).

16. The Board also argues that *McDonnell II* is distinct from the case at bar as McDonnell's firefighters guarded "against theft or unauthorized access." Respondent's Brief at 24. This is

somewhat deceptive in that it implies that McDonnell's firefighters had some additional duties in the event of a theft or the entry of a trespasser, neither of which is true. Their only duties in this regard were to make sure appropriate doors were locked and to "exercis[e] control over unlocked doors," *McDonnell II*, 827 F.2d at 328.