# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued March 7, 2017          Decided July 18, 2017

No. 16–1191

BELLAGIO, LLC, D/B/A BELLAGIO LAS VEGAS, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

---

Consolidated with 16-1192, 16-1256, 16-1258

---

On Petitions for Review and Cross-Applications
for Enforcement of Orders of
the National Labor Relations Board

---

*Paul T. Trimmer* argued the cause for the petitioners. *Gary C. Moss* was with him on the briefs.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for the respondent. *Richard F. Griffin*, *Jr.*, General Counsel, *Jennifer Abruzzo*, Deputy General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, *Usha Dheenan*, Supervisory Attorney, and *Marni Von Wilpert*, Attorney, were with him on the brief.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* SRINIVASAN.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

> "In Vegas, everybody's gotta watch everybody else. Since the players are looking to beat the casino, the dealers are watching the players. The boxmen are watching the dealers. The floormen are watching the boxmen. The pit bosses are watching the floormen. The shift bosses are watching the pit bosses. The casino manager is watching the shift bosses. I'm watching the casino manager. And the eye in the sky is watching us all."

—Sam "Ace" Rothstein, CASINO (Universal Pictures 1995).

Because they are luxury casino resorts, petitioners Bellagio and The Mirage (collectively, casinos) have extraordinary security needs. Each has a high-end jeweler. Bellagio boasts an art gallery that has displayed Fabergé eggs and the works of Picasso. Both casinos house an array of slot machines, gaming tables, count rooms and cages containing vast amounts of cash and cash-equivalent gaming chips. To protect all of that valuable property—not to mention the property and physical safety of guests who hope to win big or have a good time trying—each of the casinos relies on a sophisticated network of surveillance cameras, locks, alarms and computers. The equipment is essential for deterring, detecting and recording wrongdoing, including misdeeds at the

hands of the casinos' own employees. And when those employees are suspected of wrongdoing, the casinos use hidden cameras to conduct targeted investigations.

We must decide whether the surveillance technicians (techs) who control the casinos' surveillance, access and alarm systems and help to investigate errant employees are "guards" under section 9(b)(3) of the National Labor Relations Act (Act), 29 U.S.C. § 159(b)(3). Designed to avert employee conflicts of interest, section 9(b)(3) precludes the National Labor Relations Board (Board) from certifying a union to represent "guards" who "enforce," against colleagues and other persons, "rules to protect property of the employer or to protect the safety of persons on the employer's premises[.]" *Id*. The Board's Regional Director found that the techs do not enforce such rules and so are not guards. Thereafter, the Board certified the International Union of Operating Engineers Local 501 (Union)—which represents several non-guard employees of the casinos—as the exclusive collective-bargaining representative for a unit of techs at each casino. The casinos refused to bargain with the Union. The Board concluded that the casinos thereby violated section 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5). [1] In two materially identical

---

[1] Section 8(a)(1) makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7, including the right "to bargain collectively through representatives of their own choosing[.]" 29 U.S.C. §§ 157, 158(a)(1). Section 8(a)(5) makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees[.]" *Id*. § 158(a)(5). "Because of the overlap in provisions, an employer who violates section 8(a)(5) also, derivatively, violates section 8(a)(1)." *Scomas of Sausalito, LLC v. NLRB*, 849 F.3d 1147, 1153 n.3 (D.C. Cir. 2017) (internal quotation omitted).

decisions, it ordered each casino to recognize and bargain with the Union.

The casinos petition for review of the Board's orders. The Board seeks enforcement. We grant the casinos' petitions, deny the Board's cross-applications for enforcement and vacate the Board's decisions and orders, which are contrary to the record evidence considered as a whole. 29 U.S.C. § 160(e), (f). On our view of the record, the techs' day-to-day duties—sensitive ones peculiar to the modern gaming industry—call for them to enforce against coworkers and others the rules that protect the casinos' property and guests. Accordingly, under section 9(b)(3), the techs are guards who can be represented only by an all-guard union.

## I.  BACKGROUND

Guard status is a "factual question[]" tied to the particulars of each case. *Burns Int'l Sec. Servs.*, 278 NLRB 565, 569 (1986). Whether specific employees are guards "can be answered only by carefully examining their duties." *Id*. We therefore discuss the techs' duties in detail, drawing our descriptions from the testimony that casino personnel gave during representation hearings conducted by a Board hearing officer. We then summarize the Board proceedings.

### A.  THE TECHS' DUTIES IN CONTEXT

MGM Resorts International owns and operates several casino resorts in Las Vegas, Nevada, including petitioners Bellagio and The Mirage. For the most part we do not differentiate between the two casinos because their practices, as relevant to this case, are all but identical.

## 1. Surveillance and security

Each of the two casinos has a surveillance department and a security department. As required by Nevada law—which provides that a licensed casino must have a "surveillance system . . . to assist the licensee and the state in safeguarding the licensee's assets [and] in deterring, detecting and prosecuting criminal acts," NEV. GAMING REG. 5.160(2)—each casino's surveillance department uses a network of high-tech cameras to oversee slot machines, gaming tables, count rooms and cashier cages. The cameras transmit live footage to a monitor room, where two to four surveillance operators per shift watch the footage in real time for suspicious activity, and to a server room, where the footage is stored on a "really fancy" "s[o]uped-up" computer system for future use. Mirage Tr. 54. Stored footage is critical because hundreds of cameras (about 1,100 at Bellagio and 700 at The Mirage) canvass the gaming floor; the few on-duty operators cannot see everything as it happens.

Ultimately, the surveillance department's job is to protect the casino's property and guests "according to policy and procedure," especially by ensuring that dealers and players do not cheat the games. Mirage Tr. 32. The security department has the same job but with an additional focus on non-gaming areas such as the jewelers and art gallery, retail and recreational areas, hotel towers, parking garages and employee-only locations. In other words, security officers patrol the entire resort for potential threats to the "security of the guests, the employees and the property itself." *Id*. at 172. A second camera system, not subject to gaming regulations, covers the non-gaming areas. The security officers monitor non-gaming video feeds in their own monitor room. The officers on patrol respond to reports from that room and from the surveillance department's monitor room. In the event of cheating or a

safety threat, the officers take appropriate action such as restraining a patron or escorting him off the property.

## 2. The techs

The techs work with both the surveillance and security departments and have wide-ranging duties. They are charged with designing, installing and maintaining the surveillance department's gaming-floor camera system in a manner that complies with Nevada gaming regulations. Maintenance does not mean merely fixing broken equipment. The gaming-floor setup is often in flux. On the frequent occasions when slot machines and table games are moved, the techs must adjust the camera coverage so that it still captures all of the legally required information, including the identity of dealers and players, card ranks and suits, bets, payouts and the like. By law, the coverage must be adequate to prevent cheating. Thus, the techs are in frequent and direct contact with both the surveillance monitor room and Nevada's Gaming Control Board, proposing coverage, taking pictures, making submissions on deadline and obtaining the necessary regulatory approvals.[2]

---

[2] As an example, Bellagio techs in 2015 designed and installed ad hoc surveillance coverage for a Super Bowl party involving an auxiliary sports book and gaming pit. One of the techs was in direct communication with the Gaming Control Board, forwarded a proposed layout and obtained the necessary regulatory approval. That was consistent with standard practice: about once a month on average the techs must configure and get regulatory approval for coverage of a special gaming event. *See, e.g.*, Mirage Tr. 66-68 (auxiliary betting stations for fight between Floyd Mayweather and Manny Pacquiao); Bellagio Tr. 75-83 ($500,000 baccarat tournament).

The techs also oversee the server room and are solely responsible for the elaborate computer system that manages "[b]asically every aspect of . . . digital surveillance," including not only the surveillance department's cameras but the security department's as well. Bellagio Tr. 58. No one except the techs and the surveillance director work on that computer system or on the cameras and related equipment maintained throughout the casino. And because the techs and the surveillance director are "the keepers of the system," *id*. at 101, only they can unilaterally turn video feeds on and off; add and delete cameras and users; restrict a user's access to particular views and footage; stop cameras from recording; and delete footage from the server. The surveillance operators and security officers have no such authority. In practical terms, then, a tech can significantly affect what an operator or officer sees on video at any given moment.

The surveillance operators and security officers rely on and communicate daily with the techs. The operators and officers report any problem with coverage or equipment so that the techs can correct it. The techs train the operators and officers on how to use the computers, change camera views and archive video files. The techs also help the operators and officers extract footage from the server for evidentiary use. And if tampering with a camera is suspected, the techs, not the operators or officers, are the ones who investigate.[3]

---

[3] Surveillance operators and security officers are on-site 24 hours a day, whereas the techs' on-site hours run between about 3:00 a.m. and 2:00 p.m., when their work on the gaming floor is least likely to interfere with business. But because the surveillance system is "vital" to operations, Bellagio Tr. 122, because malfunctions can "jeopardize" the casinos' gaming licenses, *id*. at

Moreover, the techs' duties reach well beyond everyday camera coverage. The techs maintain each casino's electronic access system. The access system consists of code-activated magnetic locks that control access to "sensitive area[s]" like the server room, the monitor rooms, the art gallery, executive offices, count rooms and the main casino cage — the last of which is subject to especially restrictive controls because it is "the hub of all gaming funds" and is much "like [a] bank" in the amount of money it houses. Mirage Tr. 58; Bellagio Tr. 89, 93. Only the techs and the surveillance director have electronic control over the access system. Accordingly, and although they act at the direction of human resources and other supervisory personnel, only the techs and the surveillance director can program the codes that limit each employee's access to specific locations within the casino. The techs themselves have full access to all areas because they must tend to cameras and equipment "almost everywhere." Bellagio Tr. 145.

As with the access system, the techs install and maintain computerized alarm systems for jewelry, art displays, count rooms and cages. No other employees do such work. The techs have the ability to arm and disarm the alarms. And if a miscreant defeats an alarm, the techs investigate how he did so.

Finally, and perhaps most importantly for our purpose, techs often participate in targeted investigations of fellow employees suspected of wrongdoing. In the typical investigation—known as an "integrity check," a "special operation[]" or simply a "special[]," Bellagio Tr. 105, 177, 183—the tech either installs a purpose-built covert camera somewhere in the target employee's work area or "lock[s]" an

38, and because no one else can perform the techs' work, at least one tech remains on call at all times.

existing camera onto the area without the employee's knowledge.[4] Mirage Tr. 110-11. Special operations are conducted, on average, about once or twice per month. Because the tech has to devise coverage that will capture the suspected misconduct, he is usually given "[s]pecifics" like the "nature" of the misconduct and "what kind of employee" is suspected of it. *Id*. at 105-06; *see id*. at 164, 190, 195 (tech typically knows why he is setting up coverage in specific area); *but see id*. at 106 (tech typically is not given target employee's name).

Although a tech's role in a special operation is limited to ensuring proper coverage and retrieving footage afterward, his participation is essential: no other employees devise and install secret cameras. Also, the surveillance and security personnel conducting the investigation count on the tech to coordinate with them, especially to maintain secrecy. Just as "what happens in Vegas stays in Vegas," *see History of Las Vegas*, LAS VEGAS CONVENTION AND VISITORS AUTHORITY, www.lvcva.com/stats-and-facts/history-of-las-vegas/ (noting tagline coined in 2003), the casinos have a "policy" that "whatever happens in surveillance doesn't leave," Bellagio Tr. 139-40. During a special operation, a tech is not to disclose its existence to personnel who do not need to know about it.

---

[4] Again as an example, The Mirage's techs in 2015 hid a camera inside a clock radio within a staged guest room to catch a housekeeper stealing items planted in the room. That was consistent with standard practice. *See, e.g.*, Mirage Tr. 92-94 (techs installed covert camera in air duct to investigate graveyard-shift supervisor suspected of sleeping on job); *id*. at 196-98 (techs installed covert camera in ceiling to investigate security employee suspected of stealing lost-and-found items); Bellagio Tr. 179-81 (techs installed covert camera in ceiling to investigate poker dealer suspected of stealing from coworkers).

Indeed, to ensure that the operation is not compromised, the tech must sometimes use his control over the computer system to "cut off" video coverage to some employees and tell them a "story" that the system is malfunctioning.  *Id*. at 175-76.

The foregoing duties are sensitive and important enough that the techs are considered "key employees" under Nevada's gaming regulations.  Mirage Tr. 50-51.  A key employee is one who has "the power to exercise a significant influence over decisions concerning any part of the operation of a gaming licensee . . . ."  NEV. GAMING REG. 3.110(1).  Casinos subject key employees to special restrictions and background checks.  And so it is with the techs.  Because of the techs' comprehensive knowledge and access, the casinos must put "quite a bit of trust . . . in [their] integrity."  Bellagio Tr. 138.  The techs are therefore subject to more stringent background checks than are most other employees, including security officers.

Having detailed what the techs do, we complete the picture by describing what they do *not* do.  Unlike a security officer, a tech does not carry a weapon or handcuffs; does not patrol the resort for misconduct; does not restrain an unruly guest; and does not physically confront a cheater or a thief.  Unlike an officer or surveillance operator, a tech does not watch live feeds or stored footage for wrongdoing and does not document it.[5]  And when a tech participates in a special operation, he does not confront or interview the targeted employee.

---

[5]  Like all other employees, however, a tech is expected to report suspicious activity when he encounters it.

## B. THE BOARD PROCEEDINGS

The Union petitioned the Board for certification under section 9(c) of the Act, 29 U.S.C. § 159(c), seeking to represent a bargaining unit of all the techs at each of the two casinos. On each of its two petitions, the Union did not fill out Box 7, which asked whether it had requested recognition from the respective casino and what the result was. The casinos moved to dismiss the petitions, relying on 29 C.F.R. § 102.61(a). In pertinent part, section 102.61(a) provides that "[a] petition for certification . . . shall contain . . . [a] statement that the employer declines to recognize the petitioner as the representative" of the bargaining unit the petitioner claims is appropriate. *Id*. § 102.61(a)(8). The Board's Regional Director denied the casinos' motions, rejecting their argument that section 102.61(a) required dismissal.

The casinos then opposed the petitions on the merits. As relevant here, they argued that the techs are guards under section 9(b)(3) of the Act, precluding the Board from certifying the Union as the techs' representative because the Union represents non-guard employees.[6]

A hearing officer conducted hearings on both of the Union's petitions. At the outset, the Union asked the casinos for recognition. The casinos declined. Casino personnel then testified to the techs' duties as described above.

---

[6] The casinos also argued that the techs are "confidential employees." *See NLRB v. Hendricks Cty. Rural Elec. Membership Corp.*, 454 U.S. 170 (1981). They renew that contention here but we do not consider it in light of our conclusion that the techs are guards.

After reviewing the testimony, the Regional Director concluded that the techs are not guards, reasoning that their "responsibilities are limited to the installation, modification, removal, and maintenance of the video monitoring system." Joint Appendix (JA) 438, 881. In the Regional Director's view, the techs do not "enforce rules to protect property or persons" because they "make no rounds, and are required to watch for nothing other than issues affecting the surveillance system." JA 438-39, 881. The Regional Director noted the techs' role in special investigations and their control over other employees' access to the surveillance system and to sensitive areas within the casino. But he gave no weight to those facts and stated that installing cameras "to assist others" in enforcing rules is "insufficient" for guard status. JA 439, 881.

The Regional Director found Bellagio's techs to be one appropriate bargaining unit and The Mirage's techs to be another. He ordered that a representation election be conducted for each unit. In each case, the techs voted for the Union, which was thereafter certified as the exclusive collective-bargaining representative for each unit. The casinos sought review before the Board, which denied it on the ground that the casinos had "raise[d] no substantial issues." JA 443, 885. In a footnote, the Board "agree[d]" with the Regional Director's analysis of the guard issue. JA 443 n.1, 885 n.1. It added that "the Board and the courts have long rejected the notion that individuals should be deemed guards because their installation or maintenance of equipment is an integral part of a larger security system that other individuals actually operate." *Id.* (citing *Wells Fargo Alarm Servs. v. NLRB*, 533 F.2d 121, 124 (3d Cir. 1976); *Am. Dist. Tel. Co.*, 160 NLRB 1130, 1138 (1966)).

The casinos could not seek judicial review at that point, *see Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 139

(1971), so they refused to bargain with the Union and renewed their claims in defense against the Union's unfair labor practice claims. In May 2016, the Board issued two materially identical decisions concluding that each casino violated section 8(a)(1) and (5) of the Act by refusing to bargain. In each instance, it ordered the respective casino to recognize and bargain with the Union.

## II.  ANALYSIS

The casinos now seek review in this Court, urging that (1) the Union's petitions should have been dismissed for failure to comply with 29 C.F.R. § 102.61(a); and (2) the techs are guards under section 9(b)(3) of the Act. We reject the first claim but agree with the second.

### A.  THE CASINOS' PROCEDURAL OBJECTION

The casinos' objection under section 102.61(a) need not detain us long. As noted, the provision states in relevant part that "[a] petition for certification . . . shall contain . . . [a] statement that the employer declines to recognize the petitioner as the representative" of the bargaining unit the petitioner claims is appropriate. 29 C.F.R. § 102.61(a)(8). The casinos argue that "shall" means compliance is mandatory. That may well be so. *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily the language of command." (some internal quotations omitted)). And there is no disputing that the Union's certification petitions fell short. Box 7 of the standard-form petition asks whether and when the petitioner requested recognition and if the employer declined or simply did not respond. Here, the Union left Box 7 blank.

But the casinos cite no authority for the proposition that dismissal is always the remedy for a non-compliant petition. They contend that "[p]rocedural due process requires the

[Board] to adhere to its own rules." Br. of Pet'rs 41. Assuming *arguendo* they are correct, the assertion gets them nowhere; the text of section 102.61(a) does not dictate dismissal for a violation, let alone a de minimis violation cured at the representation hearing.[7] That is what happened at the hearings here: the Union sought recognition and the casinos declined. The casinos do not contest that the violation was thereby cured. Indeed, they conceded at oral argument that they suffered no prejudice. Oral Arg. Recording 2:00-2:26, 5:55-5:57.

The Board has held that a union's failure to state in a certification petition that "it has requested recognition and the employer has declined" may be cured at the representation hearing. *Aria Resort & Casino, LLC*, 363 NLRB No. 24, at 1 (2015). Similarly, at least one court of appeals has concluded that "it would be [a] senseless technicality" to require dismissal "where the demand and refusal of recognition [is] established at the hearing itself." *NLRB v. Superior Cable Corp.*, 246 F.2d 539, 540 (4th Cir. 1957) (per curiam). We see no good reason to part company with the Board and a sister circuit on this issue, especially in view of the deference we owe the Board's interpretation of its own regulation. *Rush Univ. Med.*

---

[7] The lack of a text-mandated consequence in section 102.61(a) distinguishes it from section 102.62(d), which the casinos also cite. Section 102.62(d) provides that an employer's violation of certain voting procedures "shall be grounds for setting aside the election whenever proper and timely objections are filed." Section 102.62(d) thus makes section 102.61(a)'s silence more deafening: the Board plainly "knows how to" mandate a particular remedy "when it wants to." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 416 (2009) (internal quotation omitted).

*Ctr. v. NLRB*, 833 F.3d 202, 206-07 (D.C. Cir. 2016); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).

## B.  THE TECHS' GUARD STATUS

That brings us to the gravamen of the case.  Are the casinos' surveillance technicians "guards" under section 9(b)(3) of the Act?  Because the question is predominantly factual, *Burns Int'l Sec. Servs.*, 278 NLRB at 569, we will disturb the Board's determination only if it is "[un]supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 160(e), (f); *see Local 851, Int'l Bhd. of Teamsters v. NLRB*, 732 F.2d 43, 44 (2d Cir. 1984) (per curiam).  The standard is deferential but not abject: "We may not find substantial evidence merely on the basis of evidence which in and of itself justified the Board's decision, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn."  *NLRB v. Tito Contractors, Inc.*, 847 F.3d 724, 732-33 (D.C. Cir. 2017) (internal quotations and brackets omitted); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

### 1.  Section 9(b)(3)

We cannot properly appraise the evidence of the techs' guard status without first understanding what a guard is.  So "[w]e begin, as we must, with the text of the statute." *NetCoalition v. SEC*, 715 F.3d 342, 348 (D.C. Cir. 2013). Section 9(b)(3) of the Act precludes the Board from

> decid[ing] that any unit is appropriate for [collective-bargaining] purposes if it includes, together with other employees, any individual employed as a guard to enforce against

employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises; but no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership, or is affiliated directly or indirectly with an organization which admits to membership, employees other than guards.

29 U.S.C. § 159(b)(3). The Board concedes that the Union "admits to membership . . . employees other than guards," *id.*, and that the Union therefore cannot represent the techs if they are guards, Br. of Resp't 23; *see Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 8 (2d Cir. 1985) (noting that second clause of section 9(b)(3) "denies" union representing non-guards "the right to be certified as a representative of a unit of guards"). The question, then, is whether a tech is an "individual employed as a guard to enforce against employees and other persons rules to protect property of the employer or to protect the safety of persons on the employer's premises." 29 U.S.C. § 159(b)(3).

As a threshold matter, the casinos contend that a tech is a guard if he is an "individual employed . . . to enforce . . . rules to protect property of the employer" or if he is an "individual employed . . . to protect the safety of persons on the employer's premises." On the casinos' interpretation, an employee who protects patron safety can be a guard even if he does not "enforce . . . rules." The casinos forfeited that contention by waiting until their reply brief to advance it. *Bartko v. SEC*, 845 F.3d 1217, 1225 n.7 (D.C. Cir. 2017). In any case, their interpretation is unsound. It ignores the "rule of the last antecedent," under which we presume—absent indicia to the contrary—that a modifier does not reach back to a previous

phrase if it can be read to modify a more proximal one. *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (internal quotation omitted). In section 9(b)(3), the phrase "to protect the safety of persons on the employer's premises" does not reach back to modify "individual employed as a guard"; instead it describes the "rules" "enforce[d]" by that individual. After all, the same sentence first mentions "*rules to protect* property of the employer." 29 U.S.C. § 159(b)(3) (emphasis added). It makes sense to read the second iteration of "to protect" in parallel fashion — i.e., to modify "rules" just as the first iteration of "to protect" does. *Cf. Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164-65 (1985) ("It is logical to assume that the same word has the same meaning when it is . . . used earlier in the same sentence."). In short, some guards enforce rules to protect the employer's property and other guards enforce rules to protect people on the premises. But an employee cannot be a guard unless he enforces rules, be they the former kind or the latter (or both).

Because a tech is a guard only if he "enforce[s] . . . rules" to protect the casinos' property or patrons, we examine the meaning of "enforce." The leading law dictionary gives it a broad definition: to "enforce" rules is "[t]o give force or effect to" them. BLACK'S LAW DICTIONARY 645 (10th ed. 2014). Similarly, the Board has long construed the concept "very broadly" in a manner that does not require "personal confrontation." *McDonnell Aircraft Co. v. NLRB*, 827 F.2d 324, 327 (8th Cir. 1987) (citing Board cases). In *Wright Memorial Hospital*, 255 NLRB 1319 (1980), for instance, the Board concluded that ambulance drivers who were "on the lookout for fire, theft, vandalism, and unauthorized personnel" were guards. *Id*. at 1320. In the Board's view, it did not matter that when the drivers "discover[ed] an irregularity or violation," they took "no action on their own" but instead informed a department head. *Id*. The Board deemed it

"sufficient" that the drivers had "responsibility to observe and report infractions, as this is an essential step in the procedure for enforcement of hospital rules." [8] *Id.*; *see id.* ("It is immaterial that [the drivers] do not themselves enforce these rules.").

The Board applied the same expansive interpretation in *MGM Grand Hotel*, 274 NLRB 139 (1985). It held that the operators of an electronic fire and security system at a Las Vegas hotel were guards. *Id.* at 139-40. Two operators per shift "monitor[ed] door exit alarms, stairwell motion detectors, a watch tour system, and other systems." *Id.* at 139. The operators were only to observe and report; they left it to security officers to "deal[] with cheating, injury, theft, misconduct, and illness." *Id.* Much as in *Wright Memorial Hospital*, the Board reasoned that the operators' lack of direct contact with wrongdoers did "not detract from their guard status" because they performed "an essential step in the procedure for the enforcement of the employer's rules." *Id.* at 140 n.10 (brackets omitted) (quoting *A.W. Schlesinger Geriatric Ctr.*, 267 NLRB 1363, 1364 (1983)).

Congressional intent, discernible from plain language, supports the broad interpretation in *Wright Memorial Hospital* and *MGM Grand Hotel*. The statute provides that a guard is someone who enforces rules "against *employees* and other persons." 29 U.S.C. § 159(b)(3) (emphasis added). The Congress's purpose in passing section 9(b)(3) was "to minimize the danger of divided loyalty that arises when a guard

---

[8] The Board's expansive interpretation has led to guard status for a diverse array of employees, not only quintessential guards like security officers. *See McDonnell Aircraft*, 827 F.2d at 326 (citing cases involving, e.g., "unarmed courier service drivers," "fitting room checkers," "timekeepers" and "receptionists").

is called upon to enforce the rules of his employer against a fellow union member." *Drivers, Chauffeurs, Warehousemen & Helpers v. NLRB*, 553 F.2d 1368, 1373 (D.C. Cir. 1977) (*Drivers & Chauffeurs*); *see BPS Guard Servs., Inc. v. NLRB*, 942 F.2d 519, 526 (8th Cir. 1991) ("danger of divided loyalty" is "measuring stick of Section 9(b)(3) status" (internal quotation omitted)). And monitoring one's fellow union members can result in conflicts of interest without personal confrontation.

In its brief and at oral argument, the Board suggested the Congress's purpose is implicated only "during periods of strikes or labor unrest." Br. of Resp't 23-24; *see* Oral Arg. Recording 23:29-23:39 ("[T]he question of divided loyalty is actually as to whether these guards would, say, refuse to cross a picket line or refuse to actually enforce a rule against another employee."); *id.* at 27:01-27:05 ("[T]he policy stems from workplace disputes . . . ."). Granted, the Congress "may have had plant guards primarily in mind" when it enacted section 9(b)(3), inasmuch as it was "[r]eacting to" United States Supreme Court cases involving plant-protection employees. *Drivers & Chauffeurs*, 553 F.2d at 1373 (internal quotation omitted) (citing *NLRB v. Jones & Laughlin Steel Corp.*, 331 U.S. 416 (1947); *NLRB v. E.C. Atkins & Co.*, 331 U.S. 398 (1947)). But as we pointed out in *Drivers & Chauffeurs*, nothing in the statutory language suggests the Congress "was blind to the potential for conflict inherent in [other] employment contexts." *Id.*; *see id.* at 1373-74 n.11 (no indication "that Congress intended to draft a provision limited to the facts of" *Jones & Laughlin* and *Atkins*). And, notably, neither *Wright Memorial Hospital* nor *MGM Grand Hotel* involved plant protection or labor unrest.

## 2. The evidence as a whole

With the foregoing principles in mind, we turn back to the record evidence. Taken as a whole, it demonstrates that the techs perform "an essential step in the . . . enforcement" of rules to protect the casinos' property and patrons, including enforcement against their fellow employees. *MGM Grand Hotel*, 274 NLRB at 140 n.10 (internal quotation omitted); *Wright Mem'l Hosp.*, 255 NLRB at 1320.

To recap just the highlights, the techs maintain comprehensive camera coverage of each resort, including the ever-changing gaming floor; they control access to all sensitive areas of each casino and have access to all areas themselves; they maintain alarm systems for the most valuable property in each casino; and they help spy on fellow employees suspected of misconduct. The Regional Director minimized these duties because they require "mak[ing] no rounds" and "watch[ing] for nothing other than issues affecting the surveillance system." JA 439, 881. The Board "agree[d]" with the Regional Director and discounted the fact that the techs' duties are "an integral part of a larger security system." JA 443 n.1, 885 n.1 (citing *Wells Fargo Alarm Servs.*, 533 F.2d at 124; *Am. Dist. Tel. Co.*, 160 NLRB at 1138). We see at least four problems with the Board's analysis.

*First*, it gives no weight to evidence that the surveillance operators and security officers in the monitor rooms cannot properly do their jobs without the techs. *See, e.g.*, Mirage Tr. 115 (Q: "[C]an the surveillance operator[s] perform their job without the surveillance techs?" A: "No."); *id*. at 217 (Q: "Can the security department perform its function . . . without the surveillance techs?" A: "No."). That the techs do not themselves observe, report and respond to misconduct is therefore not dispositive: they are "essential" to the process.

*MGM Grand Hotel*, 274 NLRB at 140 n.10; *Wright Mem'l Hosp.*, 255 NLRB at 1320.

Moreover, the surveillance operators and security officers cannot watch every live camera feed. That fact heightens the importance of stored footage, which the techs aid in extracting; it also helps illustrate the deterrent function that the cameras serve *even apart from the monitor-room operators and officers*. Consider Bellagio's frequent tournaments, like the $500,000 baccarat tournament it held in June 2015. *See supra* note 2. In such tournaments, players face off against one another in an attempt to win money from a sizable prize pool. It is not "unheard of" for a player to cheat by "pilfer[ing] chips" from an opponent when no one is looking. Bellagio Tr. 83. Because the casino does not post a security officer to each table, "the cameras are the sole means of detecting that kind of theft." *Id*. at 84. If the surveillance operators in the monitor room do not see the misconduct when it occurs, the stored footage can be reviewed afterward to resolve any dispute. Just as significantly, the cameras help "prevent" such disputes in the first place because the players know they are being watched and are less likely to cheat than they would be otherwise. *Id*. at 83; *see id*. at 126 ("We're in a casino. . . . Everybody's basically aware . . . that cameras are present.").

In short, camera coverage protects the players' property and safety. This commonsense observation applies similarly to the casinos' property: the existence of the camera coverage discourages dealer dishonesty and encourages dealer accuracy, just as the presence of the alarm system deters robbery.

The techs are critical to the deterrence because they are critical to the technology. The techs, not the surveillance operators and security officers, investigate any tampering with the cameras — which are themselves casino property. The

techs, not the operators and officers, coordinate with regulators to maintain conforming coverage and ensure the continued validity of the casinos' gaming licenses. The Board does not argue that the full range of the techs' work could just as easily be performed by other personnel such as the operators or officers. Nor could such an argument succeed on this record: the surveillance and security networks, comprised of high-tech cameras and a "really fancy" "s[o]uped-up" computer system, Mirage Tr. 54, are complicated enough that the techs train the operators and officers on how to use them.

*Second*, the Board gives too little weight to the type of employer we are discussing. In the agency proceedings it invoked two cases, respectively 41 and 51 years old, that necessarily did not involve ultramodern luxury casinos. JA 443 n.1, 885 n.1 (citing *Wells Fargo Alarm Servs.*, 533 F.2d at 124; *Am. Dist. Tel. Co.*, 160 NLRB at 1138). In *MGM Grand Hotel*, decided in 1985, the Board itself distinguished both cases, partly because they had "not contemplated" the "technological advance" embodied in MGM's "vastly sophisticated" security system. 274 NLRB at 140 & nn.8-9. That observation applies with greater force 32 years later to surveillance and security networks that are more sophisticated still.

The casinos' networks protect high-end jewelry, priceless art, stockpiles of cash and the personal safety of revelrous guests who are not always vigilant regarding their own wellbeing. In that regard, the casinos are nigh *sui generis*. The closest analog we can think of is a bank.[9]  *Cf.* Mirage Tr.

---

[9]  Indeed, for some purposes under United States Code title 31 ("Money and Finance"), a licensed luxury casino is deemed a "financial institution" much like a bank or credit union. *See* 31 U.S.C. § 5312(a)(2)(X).

58 (main cage is "like our bank"); Bellagio Tr. 93 ("There's [a] . . . lot of money in the cage."). But even a bank does not have to contend with scores of live transactions every instant in a charged entertainment atmosphere. In this unusual setting, where all-encompassing surveillance is the paramount protector, the Board assigns too much weight to the fact that the techs do not "perform traditional guard functions," Br. of Resp't 30, such as carrying weapons, *id*. at 8-9, 25, and "mak[ing] rounds," JA 439, 881.

*Third*, the Board does not properly account for the fact that the techs can control what surveillance operators and security officers see in the monitor rooms. They likewise control which employees can enter "sensitive area[s]" like the server room, the monitor rooms, the art gallery, executive offices, count rooms and the main casino cage. Bellagio Tr. 89. The techs thereby enforce—i.e., "give . . . effect to," BLACK'S LAW DICTIONARY, *supra*, at 645—their supervisors' rules for protecting the casinos' most valuable property. Other courts and the Board itself have indicated that control over access to physical property is relevant to guard status. *See, e.g.*, *Local 851, Int'l Bhd. of Teamsters*, 732 F.2d at 44 (drivers were guards where, *inter alia*, they were "often given keys to the premises and security vaults of customers"); *Wright Mem'l Hosp.*, 255 NLRB at 1320 (ambulance drivers were guards where, *inter alia*, they "check[ed] to see that doors [were] locked"). We see no basis for a different approach here.

The Board ignores that, because of the techs' know-how and access, the casinos must put "quite a bit of trust . . . in [their] integrity," Bellagio Tr. 138, and subject them to stringent background checks. It does not require a screenwriter's imagination to appreciate the risks of sabotage: the record is replete with testimony about how a dishonest tech might realistically abuse his position at the expense of his

employer. *See, e.g.*, *id.* at 102, 251-52 (without need for "anyone's approval," tech could "maliciously" "shut cameras off," "prevent [them] from recording" or "delete specific periods of time in the recording stream"); *see also, e.g.*, Mirage Tr. 119-20, 248-49 (without "being detect[ed]," tech could enter sensitive areas or grant unauthorized access to others "at just the push of a button").

The Board argues that "[t]he potential for sabotage isn't enough to make [a tech] a guard." Oral Arg. Recording 32:10-32:15. But even assuming the potential for sabotage does not *suffice* for guard status, the authority, access and trust conferred on the techs are *relevant*. *See, e.g.*, *Local 851, Int'l Bhd. of Teamsters*, 732 F.2d at 44 (drivers were guards because, *inter alia*, they were "entrusted with a wide variety of valuable commodities" and were "subjected to security clearance"); *Burns Int'l Sec. Servs.*, 278 NLRB at 569 (guard status may "depend largely on the extent to which [the employee] protect[s] . . . property").

*Fourth*, the Board gives no weight to the crucial fact that the techs help enforce rules against their *coworkers*, most obviously during special operations. In a special operation, a tech installs a secret camera in—or covertly locks an existing camera onto—a coworker's work area so that other surveillance and security personnel can spy on the targeted employee. In denigrating the tech's role as "limited," JA 438-39, 881, the Regional Director overlooked evidence that the tech is essential to the operation, Bellagio Tr. 222 (Q: "Would your investigators be able to perform the types of investigations that they conduct . . . without video surveillance?" A: "No."). His analysis also overlooked that the tech is expected to maintain the secrecy of the operation, including by cutting off video coverage to other employees and, if necessary, lying to them about it.

The tech's duties in a special operation squarely implicate section 9(b)(3)'s aim of "minimiz[ing] the danger of divided loyalty that arises when a guard is called upon to enforce the rules of his employer against a fellow union member." *Drivers & Chauffeurs*, 553 F.2d at 1373. The operation can lead to serious consequences for the target employee, including termination and potentially prosecution. If the Union were to represent both the techs and their target colleagues, the techs might well feel pressure to tip off fellow Union members about particular operations.

The Regional Director saw "[n]o evidence . . . that techs know the identity of the persons being investigated." JA 436. We read the record differently. Although the techs typically are not given the target employee's name, they *are* given "[s]pecifics" like the "nature" of the misconduct, "what kind of employee" is suspected of it and where it is occurring. Mirage Tr. 105-06; *see id*. at 164, 190, 195 (tech typically knows why he is setting up coverage in specific area); Bellagio Tr. 105 (he is typically "given details"). That information, it seems to us, would suffice for a conflicted tech to thwart a proper investigation.

The Board characterizes wrongful disclosure of such information as a mere "possibility." Br. of Resp't 40. But Section 9(b)(3) is meant "to minimize the *danger* of divided loyalty." *Drivers & Chauffeurs*, 553 F.2d at 1373 (emphasis added). The focus is on minimizing temptation, pressure and conflict, not on whether the tech will in fact betray the casino. *NLRB v. Brinks, Inc.*, 843 F.2d 448, 454 (11th Cir. 1988) (under section 9(b)(3), "the realistic *potential* for divided loyalties warrants the complete separation of guard and non-guard unions" (emphasis in original)); *see* 29 U.S.C. § 151 (Act is meant to alleviate "industrial strife").

\* \* \* \* \*

Considering the record as a whole, we agree with the casinos: the techs are guards under section 9(b)(3) of the Act and can be represented only by an all-guard union. Because the Union represents employees other than guards, it was improperly certified as the techs' representative and the Board erred in concluding that the casinos unfairly refused to bargain. Accordingly, we grant the casinos' petitions for review, deny the Board's cross-applications for enforcement and vacate the Board's May 2016 decisions and orders.[10]

*So ordered.*

---

[10] Our dissenting colleague would defer to the Board on the theory that it could reasonably decide the techs do not "compel obedience to" the casinos' rules. Dissent at 2 (quoting BLACK'S LAW DICTIONARY, *supra*, at 645) (emphasis omitted). But the Board's own cases—which take a "very broad[]" view of guard status—do not require compulsion of obedience. *McDonnell Aircraft Co.*, 827 F.2d at 326-27 (citing Board cases). After all, ambulance drivers, fitting room checkers, timekeepers, receptionists and casino surveillance *operators* are all guards even though they do not affirmatively compel obedience to any rules. *See supra* note 8 and accompanying text; Br. of Resp't 30 (conceding that casinos' "surveillance operators . . . perform traditional guard functions"). The inquiry turns not on compulsion or personal confrontation, *see* Dissent at 2 ("direct role"), but on whether a putative guard performs "an essential step in the procedure for the enforcement of the employer's rules." *MGM Grand Hotel*, 274 NLRB at 140 n.10 (brackets and internal quotation omitted); *see Wright Mem'l Hosp.*, 255 NLRB at 1320. We cannot defer to an agency decision that ignores extensive unrebutted evidence satisfying the agency's own governing standard. And, respectfully, the evidence is indeed extensive that the techs' duties go well beyond old-fashioned installation, inspection and repair. Dissent at 1-2 (citing *Am. Dist. Tel. Co.*, 160 NLRB at 1134, 1138 (1966)).

SRINIVASAN, *Circuit Judge*, *concurring in part and dissenting in part*:  For the reasons explained in Part II.A of the court's opinion, I agree that the failure of the Union representing the surveillance techs to seek recognition from the Casinos prior to filing its certification petitions does not require the petitions' dismissal.  I respectfully disagree, though, with my colleagues' conclusion in Part II.B that the Board was compelled to conclude that the techs are "guards" within the meaning of Section 9(b)(3) of the National Labor Relations Act.

We have explained that, when reviewing the Board's determinations about which employees constitute statutory guards, "[w]e must be particularly wary not to substitute judgment where . . . the agency's expertise illuminates the meaning of an open-ended statutory term." *Drivers, Chauffeurs, Warehousemen and Helpers, Local 71 v. NLRB*, 553 F.2d 1368, 1374 (D.C. Cir. 1977).  Here, as my colleagues explain, *ante* at 17, whether the techs qualify as guards under the Act turns on whether they "enforce rules" on behalf of the Casinos.  29 U.S.C. § 159(b)(3).

In my view, the Board might have reasonably determined, as my colleagues do, that the techs' role in maintaining the Casinos' surveillance equipment bears a sufficient connection to the enforcement of Casino rules to render them guards under the statute.  But I also believe the Board acted reasonably in reaching the opposite conclusion.  Whatever else the techs' duties entail, their responsibilities undisputedly do not encompass observing, reporting, or restraining infractions of the Casinos' rules.  I would sustain the Board's conclusion that employees who lack those duties do not "enforce rules" and thus do not qualify as statutory guards.

More than a half century ago, the Board staked out its position that responsibility "for new installations, periodic

inspections, and maintenance and repairs of . . . protective equipment" does not render an employee a guard under the NLRA. *Am. Dist. Tel. Co.*, 160 NLRB 1130, 1134, 1138 (1966). The Board has maintained that view ever since. For instance, in *MGM Grand Hotel*, the Board, while indicating that employees who "possess and exercise responsibility to observe and report infractions" qualify as guards, 274 NLRB 139, 140 n.10 (1985) (quoting *A.W. Schlesinger Geriatric Ctr.*, 267 NLRB 1363, 1364 (1983)), explicitly distinguished such employees from ones "involved [in] the installation and maintenance of certain electronic security devices," *id.* at 140 n.8. The Board adhered to that line in this case.

The Board's understanding of what it means to "enforce rules" is entirely consistent with those words' ordinary meaning. My colleagues rely on the definition of "enforce" in *Black's Law Dictionary*. Even that definition, though, readily accommodates the Board's interpretation. It is true that the definition's first entry speaks in terms of giving "force or effect" to a rule. BLACK'S LAW DICTIONARY 645 (10th ed. 2014). And had the Board determined that the techs qualify as guards, it could have attempted to reason that, by maintaining surveillance equipment, the techs help "give force or effect to" the Casinos' rules. But in reaching the opposite conclusion—that the techs fail to qualify as guards— the Board maintained full consistency with the definition: the Board could reason that the techs play an insufficiently direct role in "giving force or effect" to the Casinos' rules. Moreover, the definition states in full: "[t]o give force or effect to (a law, etc.); *to compel obedience to*." *Id.* (emphasis added). The Board's conclusion that employees qualify as guards only if they observe, report, or restrain infractions draws support from a conception of "enforce" tied to "compelling obedience" to rules.

Here, because the techs' duties do not include those functions, I would sustain the Board's conclusion that the techs may be part of the same union as the Casinos' non-guard employees. That conclusion is unaffected by the techs' role in "special operations" investigating co-workers suspected of misconduct. In that context, the techs' duties are confined to ensuring the proper positioning of surveillance cameras and retrieving the footage. *Ante* at 9. Other employees monitor the feed, review the footage, and, if warranted, interview or confront the subject of the investigation. In that sense, the techs' responsibilities in connection with investigations of co-workers parallel their duties with regard to surveillance of Casino patrons. If those functions fail to amount to enforcement of the Casinos' rules when directed at patrons, they likewise fall short of enforcement when directed at co-employees. Respectfully, I therefore believe the Board acted within its discretion in concluding that the techs' duties do not constitute enforcement of rules within the meaning of the NLRA.